UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. 4:13-CV-1150 |
| | § | |
| SEALIFT, INC., *et al*, | § | |
| | § | |
| Defendants. | § | |

## OPINION & ORDER

Pending before the Court in the above-referenced cause, in which Plaintiff, United States of America ("United States" or "Government"), is seeking to recover from Defendant-carrier Sealift, Inc. ("Sealift") for damage and loss to food-aid cargoes, are Defendant's Motion for Partial Summary Judgment (Doc. 22), Plaintiff's Response in Opposition (Doc. 24), Defendant's Reply in Support (Doc. 25), and Plaintiff's SurReply (Doc. 42). Having considered the motion, response, replies, the facts in the record, and the applicable law, the Court finds that Defendant's Motion for Partial Summary Judgment should be **DENIED.**

**I. Background**

This action is brought pursuant to the Carriage of Goods by Sea Act ("COGSA"), 46 U.S.C. app. §§ 1300–1315 (2012), and the Harter Act, 46 U.S.C. app. §§ 190–196 (2012), and concerns the extent of carrier liability for alleged loss and damage to food-aid cargoes. The cargoes at issue were transported on multiple voyages from 2007–2011 aboard M/V Abby G, M/V Advantage, M/V Cleveland, M/V Harriette, M/V Marilyn, M/V Noble Star, M/V TSGT John A Chapman, and M/V Wilson (collectively, "Vessels"), all owned, operated, chartered, managed, and otherwise controlled by Sealift.

Plaintiff seeks $3,256,370.88[1] in damages, plus interests and costs, arrest of the vessels, and a judgment of condemnation and sale entered against the arrested property, with the claim to be paid from the proceeds of the sale. The government's claims can be divided into two categories: "loadport" and "marine" claims. According to the government, the United States assesses losses of food-aid cargoes against an ocean carrier at two locations. The first is the domestic loadport, after the commodities have been received by the ocean carrier and as they are loaded aboard its ship. Once food-aid commodities are delivered by truck or railcar to the loadport terminal and recorded as received in good condition at first point of rest, the F.A.S. position[2] as defined in the booking note,[3] they immediately become the ocean carrier's responsibility. "Loadport losses" are cargo losses that occur after the transfer of custody to the carrier at the first point of rest or while being moved to proper storage aboard the ocean carrier's ship. In contrast, "marine losses" are those that are assessed at the foreign port of discharge.

---

[1] On December 19, 2014, the United States sent a letter to Sealift stating that it was reducing its claims by $36,412.34. Doc. 24-3. On August 24, 2015, with its Response in Opposition to the United States' Motion for Leave to File SurReply (Doc. 27), Sealift filed Exhibit A, DOJ Correspondence of 24 Aug. 2015, indicating that the United States was further reducing its damage claims by $142,103.26. Doc. 27-1. Plaintiff also notes in its SurReply (Doc. 42) that its Rule 1006 summary, known as "Schedule A" (Doc. 1-1), is a "work in progress" and "has not been updated to reflect formal changes to the claims made by the United States in its letter of December 2014." Since the schedule has not been updated to reflect the December changes, presumably, it has also not been updated to reflect the August changes. The exact damages figure sought is, therefore, unconfirmed at this time.

[2] "F.A.S." is an abbreviation for "free alongside ship," which means that the seller must deliver the goods to a pier and place them within reach of the ship's loading equipment. See Terms of Sale. Department of Transportation, Maritime Administration, *Glossary of Shipping Terms*, 45, 47 (2008).

[3] A booking note is a contract that outlines arrangements with a carrier for the acceptance and carriage of freight; i.e., a space reservation. A booking note differs from other forms of contract because its terms and conditions are superseded by those in the bill of lading once the cargo is shipped. *See id.* at 16, 21.

These losses only occur after clean ocean bills of lading[4] are issued and the ship begins its voyage. Upon arrival at the destination port, an independent marine surveyor attends the discharge, tallies the quantities that are unloaded and delivered in good condition, and calculates any difference from the ocean bills of lading to be charged as credits or debts against the ocean carrier's account.

Defendant's Motion for Partial Summary Judgment concerns only a subset of the government's marine claims totaling $615,073.05. Doc. 22 at 6.

In the materials pending before the Court, the parties disagree about the prerequisites for exoneration of a carrier's liability for cargo loss, the admissibility of various documents,[5] and whether Plaintiff has raised a genuine issue of material fact to preclude summary judgment for Defendant on Defendant's liability for the particular subset of claims in dispute.

**II. Legal Standard**

Summary judgment under Federal Rule of Civil Procedure 56(c) is appropriate when, viewed in the light most favorable to the nonmovant, the court determines that "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1996). Where the nonmovant bears the burden of proof at trial, the movant must offer evidence that undermines the nonmovant's claim or point out the absence of evidence supporting essential elements of the nonmovant's claim; the movant may, but is not required to, negate the elements of the

---

[4] A clean bill of lading states the types of quantities and commodities received on board the vessel in good condition and is signed by the ocean carrier or its representative.

[5] The admissibility of the government's Rule 1006 summary and underlying documents is not addressed herein, mainly because the admissibility of survey reports is well established in this circuit. The nonmovant has presented survey reports that raise genuine issues of material fact (as discussed below).

nonmovant's case to prevail on summary judgment. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Lujan v. Nat'l Wildlife Fed.*, 497 U.S. 871, 885 (1990); *Edwards v. Your Credit, Inc.*, 148 F.3d 427, 431 (5th Cir. 1998).

If the movant meets its burden and points out an absence of evidence to prove an essential element of the nonmovant's case on which the nonmovant bears the burden of proof at trial, the nonmovant must then present competent summary judgment evidence to support the essential elements of its claim and to demonstrate that there is a genuine issue of material fact for trial. *Nat'l Ass'n of Gov't Employees v. City Pub. Serv. Bd.*, 40 F.3d 698, 712 (5th Cir. 1994). "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323. The nonmovant may not rely merely on allegations, denials in a pleading, or unsubstantiated or conclusory assertions that a fact issue exists, but must set forth specific facts showing the existence of a genuine issue of material fact concerning every element of its cause(s) of action. *Morris v. Covan World Wide Moving, Inc.*, 144 F.3d 377, 380 (5th Cir. 1998).

Allegations in a plaintiff's complaint are not evidence. *Wallace v. Texas Tech Univ.*, 80 F.3d 1042, 1047 (5th Cir. 1996) ("[P]leadings are not summary judgment evidence."); *Johnston v. City of Houston, Tex.*, 14 F.3d 1056, 1060 (5th Cir. 1995) (for the party opposing the motion for summary judgment, "'only evidence—not argument, not facts in the complaint—will satisfy' the burden.") (quoting *Solo Serve Corp. v. Westtown Assoc.*, 929 F.2d 160, 164 (5th Cir. 1991)). The nonmovant must "go beyond the pleadings and by [his] own affidavits, or by depositions, answers to interrogatories and admissions on file, designate specific facts showing that there is a genuine issue of material fact for trial." *Giles v. Gen. Elec. Co.*, 245 F.3d 474, 493 (5th Cir. 2001) (citing *Celotex*, 477 U.S. at 324). The court must consider all evidence and draw all

inferences from the factual record in the light most favorable to the nonmovant, but the court may not make credibility determinations or weigh the evidence. *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007) (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000)). There is no genuine issue for trial if a rational trier could not find for the nonmoving party based on the evidence presented. *Nat'l Ass'n of Gov't Employees v. City Pub. Serv. Bd.*, 40 F.3d at 712–13.

**III. Discussion**

**A.    Liability under COGSA**

COGSA governs "all contracts for the carriage of goods by sea to or from ports of the United States and foreign trade," provided that the contract of carriage is evidenced by a bill of lading or similar document of title. 46 U.S.C. app. §§ 1301(b), 1312; *see also U.N./F.A.O. World Food Programme v. M/V TAY*, 138 F.3d 197, 200 (5th Cir. 1998). COGSA defines the rights and duties of the parties to a contract for carriage "from the time when the goods are loaded on to the time when they are discharged from the ship." 46 U.S.C. app. § 1301(e). Carriers must "properly and carefully load, handle, stow, carry, keep, care for, and discharge the goods carried." 46 U.S.C. app. § 1303(2).

Failure to adhere to COGSA subjects a carrier to liability for loss or damage to cargo unless the carrier can establish one of the exceptions listed within section 1304 of the Act. 46 U.S.C. app. § 1304(2)(a)–(q); *see M/V TAY*, 138 F.3d at 200. The exceptions cover a variety of situations, but section 1304(2)(q) ("q" clause) is the catch-all provision. The "q" clause provides that neither the carrier nor the ship shall be responsible for loss or damage arising or resulting from "[a]ny other cause arising without the actual fault and privity of the carrier and without the fault or neglect of the agents or servants of the carrier." 46 U.S.C. app. § 1304(2)(q). This circuit

has recognized that the "q" clause may shield a carrier from liability when the carrier has absolutely no control with respect to the selection and payment of port stevedores, and no control with respect as to how and when the cargo is discharged. *U.S. v. Ocean Bulk Ships, Inc.*, 248 F.3d 331, 342 (5th Cir. 2001). In order for a carrier to invoke this shield, however, there must be a "lack of practical control" that renders the carrier powerless to prevent the unlawful or negligent conduct of stevedores. *Id.*

COGSA's statutory framework initially requires the shipper to establish a prima facie case of loss or damage by "proving that the cargo for which the bill of lading was issued was loaded in an undamaged condition, and discharged in a damaged condition." *Tubacex, Inc. v. M/V Risan*, 45 F.3d 951, 954 (5th Cir. 1995). A clean bill of lading issued by the carrier to the shipper constitutes prima facie evidence that the goods were received in an undamaged condition. 46 U.S.C. app. § 1303(4) (a bill of lading is "prima facie evidence of the receipt by the carrier of the goods as therein described."); *Ocean Bulk*, 248 F.3d at 336; *Blasser Bros., Inc. v. N. Pan-Am. Line*, 628 F.2d 376, 381 (5th Cir. 1980). Damage upon discharge may be established by producing the report of an independent cargo surveyor attending the discharge. 46 U.S.C. app. § 1303(6) (stating that unless notice of loss or damage after "survey or inspection" is given to the carrier, the goods' "removal [from the carrier] shall be prima facie evidence of the delivery by the carrier of the goods as described in the bill of lading."); *U.S. v. Cent. Gulf Lines, Inc.*, 974 F.2d 621, 624–28 (5th Cir. 1992) [hereinafter *Central Gulf II*] (discussing the use of survey reports to establish loss or damage upon discharge); *see also* 22 C.F.R. § 211.9(c)(1) (requiring that a cargo surveyor attend the discharge of aid shipments made by the Agency for International Development or a cooperating sponsor).

Once a shipper has presented a prima facie case, there is a presumption of carrier liability

and the burden of proof shifts to the carrier to prove "(1) that it exercised due diligence to prevent the loss or damage to the cargo or (2) that the loss or damage was the result of one of the Act's enumerated uncontrollable causes of loss," *Ocean Bulk*, 248 F.3d at 336 (citing 46 U.S.C. app. § 1304(1), (2)) (internal quotation omitted). If the carrier is successful, the presumption of liability vanishes and the burden returns to the shipper to show that carrier negligence was at least a concurrent cause of the loss or damage to the cargo. *Id.* If the shipper successfully makes this showing, then the burden again shifts to the carrier, which must establish what portion of the loss was caused by other factors. *Blasser*, 628 F.2d at 381. If, however, the carrier is unable to apportion fault by showing what portion was not actually damaged or was damaged under one of the exceptions of section 1304(2), then it becomes liable for the full extent of the shipper's loss. *Id.*

B.   **Liability under the Harter Act**

In contrast to COGSA, the Harter Act, 46 U.S.C. app. §§ 190–196, obligates the carrier to provide "proper delivery." The Harter Act of 1893 was Congress' first attempt to comprehensively set forth the obligations of maritime carriers. *See* 2A *Benedict on Admiralty* § 11 at 2-3–2-4 (7th ed. rev. 2014). Accordingly, it defines a carrier's duties with regard to proper loading, stowage, custody, care, and delivery of cargo. *Sabah Shipyard Sdn. Bhd. v. M/V Harbel Tapper*, 178 F.3d 400, 406 (5th Cir. 1999). When Congress enacted COGSA in 1936, much of the Harter Act was superseded. *See Tapco Nigeria, Ltd. v. M/V Westwind,* 702 F.2d 1252, 1255 (5th Cir. 1983). However, COGSA expressly provides that it does not supersede the Harter Act as to "the duties, responsibilities, and liabilities of the ship or carrier prior to the time when the goods are loaded on or after the time they are discharged from the ship." 46 U.S.C. app. § 1311. As a result, COGSA does not apply either before loading or after discharge of the cargo. *Sabah*,

178 F.3d at 406 (internal citations and quotation omitted). During those periods, the Harter Act governs. *Tapco Nigeria,* 702 F.2d at 1255.

The Harter Act does not define "proper delivery." The term has been defined in general maritime law to mean discharge of the cargo upon a fit and customary wharf. *Metro. Wholesale Supply, Inc. v. M/V Royal Rainbow,* 12 F.3d 58, 61 (5th Cir. 1994). Under this definition, a carrier is required to unload the cargo onto a dock, segregate it by bill of lading and count, put it in a place of rest on the pier so that it is accessible to the consignee, and afford the consignee a reasonable opportunity to come and get it. *F.J. Walker Ltd. v. Motor Vessel Lemoncore*, 561 F.2d 1138, 1142 (5th Cir. 1977) (internal citations and quotations omitted). However, these common law requirements are subject to the now well-established rule that "proper delivery" occurs when a delivery is made in accordance with the custom, regulations, or law of the port of destination. *Servicios-Expoarma, C.A. v. Indus. Mar. Carriers, Inc.*, 135 F.3d 984, 993 (quoting *F.J. Walker*, 561 F.2d at 1142 (citing *Tan Hi v. U.S.*, 94 F. Supp. 432, 436 (N.D. Cal. 1950))). As the *Tan Hi* court explained, the duties to discharge cargo to a fit wharf, to separate each segment, and to protect the cargo until the consignee has a reasonable opportunity to remove it from the wharf, "were elements of a 'proper delivery' only when the custom, regulations, or law of the port did not otherwise provide. . . . The common-law did not permit less nor require more in the way of delivery than the usage or law of the port dictated." 94 F. Supp. at 435.

**C. Liability Relief: Custom of the Port and Loss of Practical Control Doctrines**

Importantly to the case at bar, the Fifth Circuit has repeatedly applied the custom of the port doctrine to determine when a carrier's liability ends under the Harter Act. *Allstate Ins. Co. v. Imparca Lines*, 646 F.2d 166, 168–69 (5th Cir. 1981) ("[A] carrier's delivery to persons charged by the law and usage of the port with the duty to receive cargo and distribute it to the consignee

is a good delivery on the part of the carrier."); *Tapco Nigeria*, 702 F.2d at 1258 ("We find that the carrier properly provided safe delivery to the farthest point that it could deliver[] the goods within the limitations of the law, custom, and usage of the port."); *Servicios-Expoarma*, 135 F.3d at 993 ("[T]he custom and laws of the port of La Guaria require ocean carriers to deliver cargo to an authorized customs warehouse . . . . Once IMC had properly placed its cargo in the hands of the party authorized to receive it, IMC had 'delivered' the cargo."); *All Commodities Supplies, Ltd., v. M/V ACRITAS,* 702 F.2d 1260 (5th Cir. 1983) ("[P]roper delivery under the Harter Act was accomplished by surrender of the cargo for offloading to the Nigerian stevedores as required by the law of the Port of Lagos."); *M/V TAY*, 138 F.3d at 201 ("The evidence supports the district court's finding that the ABS had no influence over the selection of the terminal or the stevedore. . . . The district court was therefore entitled to conclude[] that the cargo was delivered when the ship opened the hatches."). As a result, it is now well settled that if the usage and law of the port cause the carrier to lose "practical control" of cargo before a common law delivery has been made, carrier liability ends at the opening of the ship's hatches. *See M/V TAY*, 138 F.3d at 201.

Two of this circuit's more recent carrier-liability cases have likewise recognized that a carrier's loss of "practical control" will relieve a carrier of liability under COGSA's "q" clause. *M/V TAY*, 138 F.3d at 201; *Ocean Bulk*, 248 F.3d at 342. These cases both recognized that such a lack of "practical control" is "ordinarily associated with a breakdown of law and order so that the carrier is powerless to prevent the unlawful or negligent conduct of the stevedores." Admittedly, a breakdown of law and order may indicate that a carrier lacks control over port conditions. *See M/V TAY*, 138 F.3d at 202 ("The crew heard constant gunfire from the battles between warring factions in the city of Luanda."). However, such port conditions are not the only way a carrier can be powerless. Rather, precedent makes it clear that the carrier's lack of control over the

stevedore—not solely the absence of law and order in the discharge port—"is the critical factor." *Id.* at 201 (citing *Central Gulf II*, 974 F.2d at 629). In *Central Gulf II,* a case with facts similar to the one at bar, the government brought suit against a carrier for marine losses of famine relief cargo. The carrier argued, as Sealift does here, that it should be exonerated from liability under COGSA's "q" clause because it had relinquished control of the cargo to port authorities who had absolute duty and control over the port. 974 F.2d at 629. The Fifth Circuit rejected that argument because record evidence demonstrated that Central Gulf exercised significant control and direction over the unloading of cargo. *Id.* ("CGL could instruct the port tug authorities as to the discharge of cargo, and the port tugs would often follow CGL's instructions. In addition, CGL independently made the decision to use LASH barges and buoys attached to rope, wire, and concrete blocks.") (internal citations omitted). Most importantly, however, the court never once used the term "breakdown of law and order" nor mentioned port conditions as a dispositive factor in its holding. *See id.* at 629. Consequently, under either the Harter Act or COGSA, the essential question for determining carrier liability for cargo loss is whether—and when—the carrier loses practical control over the cargo at the discharge port.[6]

**D.      Analysis**

In its motion for partial summary judgment, Sealift argues that because it had no control in the choice of berth, choice of stevedore, imposition of security measures, or discharge operations at the destination ports involved in the marine claims at issue, delivery occurred when the ships' hatches opened. Doc. 22 at 9–11. Consequently, it cannot be held liable for any cargo losses surveyed at these ports. *Id.* Sealift further argues that the United States has not presented

---

[6] Because COGSA and the Harter Act are so similar, one commentator has noted that it often makes no difference which statute applies. *M/V TAY*, 138 F.3d at 200 (citing 2A *Benedict on Admiralty* § 14 at 2-10 (7th ed. rev. 2014)).

evidence that Sealift selected or exercised any control over the stevedores who discharged the cargo for the shipments at issue and without such evidence cannot prove its claim for those losses. *Id.* at 11. Moreover, because delivery occurred before discharge operations commenced, the government cannot rely on shore-side tallys or surveys to make out a prima facie case. *Id.* at 10–12. Sealift has attached sworn declarations of the port captains for each of the ports subject to this motion to support its claims. Docs. 22-1, 25-1. These declarations state that the port captain is familiar with the discharge port at issue and that carriers have no control over discharge operations at the port. *Ibid.* Sealift also has included letters from several ports authority confirming that carriers calling at the ports of Tema, Ghana; Mombasa, Kenya; and Banjul, Gambia have no control over discharge operations.[7] *See* Docs. 22-1, 25-1, 25-2, 25-3.

The government produced clean bills of lading for the shipments at issue with its amended complaint and has also produced excerpts from survey reports in its response in opposition to the motion at issue.[8] The survey reports indicate damage to the cargoes. *See* Docs. 24-4 and 24-5. Sealift alleges that the government cannot rely on these surveys to support a prima facie claim "because such evidence does not document the condition of the cargoes at the time and place of proper delivery, *i.e.*, the opening of the ships' hatches." Doc. 22 at 12. Contrary to Defendant's claim, this circuit has made clear that a clean bill of lading and the report of an independent cargo surveyor attending the discharge are sufficient to make out a prima facie case of loss or damage under COGSA. *Ocean Bulk*, 248 F.3d at 337 ("the United States satisfactorily establishe[s] a prima facie case of loss or damage under COGSA by

---

[7] The additional ports at issue in these claims for which there are no letters from port authorities are Freetown, Sierra Leone; Cotonou, Benin; Lobito, Angola; Toamasina, Madagascar; Dar es Salaam, Tanzania; and Chittagong, Bangladesh.
[8] Survey reports are admissible under the public records exception to the hearsay rule. *See U.S. v. Central Gulf Lines, Inc.*, 747 F.2d 315 (5th Cir. 1984); *Central Gulf Lines II*, 974 F.2d at 626.

producing clean bills of lading for each shipment, paired with records unambiguously documenting that the cargo was either missing or damaged when discharged at the destination port.").[9] Moreover, the survey report excerpts that the government relies on often do state explicitly that the surveys and tallys were conducted as the hatches were opened and before discharge operations began.[10] However, to the extent that the reports are not clear as to when damage tallys were taken, and in light of the afore-mentioned precedent regarding carrier liability and control of cargo, the survey reports indicate that fact issues exist as to when Sealift's liability ended and whether any losses can be attributed to Sealift actions prior to the moment it allegedly lost practical control of the cargoes.[11] Furthermore, at least one of the survey report excerpts appears to raise a question about the extent of control that Sealift maintained over discharge operations.[12]

For many of the shipments, the survey excerpts suggest that cargo damage may have

---

[9] Notably, in that case, many of the same ports were involved as in the case at bar: Mombasa, Kenya; Freetown, Sierra Leone; and Tema, Ghana.

[10] "Hatch Surface Inspection of the cargo was carried out with the ship's Officer in attendance together with the Supervisor for Wilmacs Tally Services and the Representative of the ship's P & I Club present." Doc. 24-4 at 32; "Prior to commencement of discharge we inspected the cargo . . . ." Doc. 24-5 at 2; "We boarded the vessel at 0320 hrs and co-jointly with surveyors representing other cargo interests inspected the cargo and found the same to be in apparently good order and condition." Doc. 24-5 at 19.

[11] For example, some of the survey report excerpts are vague, making it difficult to know when the surveys were taken. Moreover, many of these reports are also unclear regarding what damage is attributable to carrier actions during the voyage and what was caused by stevedore or port authority negligence during and after discharge operations: "Good stowage in general; general state of commodities in holds: good. Drums damaged/leaking: 2; Empty drums: 2." Doc. 24-5 at 25.

[12] As *Central Gulf II* makes clear, the custom of the port may be for a carrier to cede authority to "port authorities who allegedly ha[ve] absolute duty and control over the port." 974 F.2d at 629. However, if there is evidence in the record that the carrier retained some authority to make independent decisions, the carrier can nevertheless be held liable. *Id.* In one survey excerpt in this case, there is a letter of protest from the surveyors to the master of the ship containing a statement that appears to indicate the carrier could pay the stevedores to induce faster discharge, which conflicts with Sealift's claims that they had no control over the stevedores at Freetown. *See* Doc. 24-4 at 81.

occurred before the hatches were opened, which based on the terms of the applicable acts, the custom of the port doctrine, and COGSA's "q" clause exception, would not relieve Sealift of liability for those cargo losses. Likewise, survey excerpts for other voyages indicate that the goods were damaged on the voyage, but additional damage and/or theft of cargo occurred during and after discharge operations began. In those cases, under COGSA's apportionment rules, Sealift may share responsibility for a portion of the losses—depending on whether it can show what portion of the loss occurred after control was ceded to the port authorities. Additionally, for M/V Advantage Voyage 58, DCN 19127, the parties' records give conflicting reports of the discharge port.[13] As mentioned above, there are also several other voyages for which the survey records are unclear as to when or how the alleged losses occurred, making it possible that Sealift remains liable for a portion of those damages. Finally, Sealift's summary judgment evidence— the port captains' declarations and letters from port authorities that it claims prove the company had no control over discharge operations—combined with one of the government's survey reports that indicates the carrier did in fact have the ability to control the stevedores,[14] raise further questions about the extent of control exercised by the carrier.

COGSA and Harter Act liability depend on when "discharge" and "delivery" occur. The custom of the port doctrine and the "q" clause, as interpreted by this circuit, make clear that carrier liability is determined by the level of control exercised by the carrier at the discharge port. Moreover, under COGSA's burden-shifting system, damages may be allocated between parties based on what portion of the loss is attributable to various factors at a number of different points between commencement of the voyage and "discharge." The evidence in the record raises

---

[13] The government's survey excerpts say the port was Djibouti (Doc. 24-4 at 9) while the Declarations (Doc 22-1 at 4) and Supplemental Declarations (Doc. 25-1 at 2) state that the port was Freetown.

[14] *See supra*, note 8.

genuine issues of material fact and law that preclude disposal of these claims by summary judgment.

## IV. Conclusion

For the foregoing reasons, it is hereby

**ORDERED** that Defendant's Motion for Partial Summary Judgment is **DENIED.**

SIGNED at Houston, Texas, this 10th day of August, 2016.

                                           MELINDA HARMON
                              UNITED STATES DISTRICT JUDGE